## THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>MARTY PINAULA MICHALEC,<br>Defendant. | CRIMINAL CASE NO. 25-00014<br><br>**DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS** |

Before the court is Defendant Marty Pinaula Michalec's Motion to Suppress Evidence ("Motion"). ECF No. 33. The court held an evidentiary hearing on the motion. After having heard the evidence and the parties' arguments, and after having reviewed the pleadings and applicable law, the court hereby **GRANTS** and **DENIES IN PART** the Motion.

## I. PROCEDURAL BACKGROUND

On November 5, 2025, the Government indicted Defendants Michalec and Richard Roy Sablan on three criminal counts: Count 1 – Conspiracy to Distribute Fifty (50) or More Grams of Methamphetamine Hydrochloride in violation of 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(B)(viii); Count 2 – Attempted Possession with Intent to Distribute Fifty (50) or More Grams of Methamphetamine Hydrochloride in violation of 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(B)(viii) and 18 U.S.C. § 2; and Count 3 – Possession with Intent to Distribute Fifty (50) or

More Grams of Methamphetamine Hydrochloride. ECF No. 1. On June 25, 2026, Michalec filed a Motion to Sever Trials and a Motion to Suppress Evidence. ECF Nos. 33 & 34. On July 27, 2026, the court granted the unopposed motion to sever and set an evidentiary hearing for Michalec's Motion. ECF No. 47.

On October 13, 2026, Michalec filed a Joinder in Sablan's Motion to Suppress and Dismiss, adopting and incorporating Sablan's arguments in support of the requested relief. ECF No. 81. Despite the court having set two separate evidentiary hearings for the two defendants, on the day of Sablan's evidentiary hearing, Michalec orally moved the court to participate in Sablan's evidentiary hearing. The court granted the oral motion and consequently consolidated the two evidentiary hearings. *See* ECF No. 85. The evidentiary hearings commenced on October 14, 2026, lasting 7 separate court days. *See* Mins., ECF Nos. 85, 97, 98, 105, 106, 110–11.

Accordingly, to the extent that Michalec joins in on Sablan's motions to suppress and to dismiss, the court incorporates by reference its discussion of the relevant facts and arguments in its separately issued decision and order resolving those motions.

## II. Factual Findings[1]

On June 25, 2025, the officers conducted a controlled delivery and delivered Package 1 to its addressed location at the Garden Villa Hotel in Tumon, Guam. According to Task Force Officer Matthew Calvo's ("Officer M. Calvo") testimony, a red Jeep pulled into the entrance of the Garden Villa Hotel, an individual retrieved Package 1, and then brought it to Apartment #200. After leaving the package in the apartment, the individual departed in the red Jeep. The same individual later returned to Apartment #200, this time in a silver Jeep, retrieved Package 1, and left the Garden Villa Hotel premises. After the silver Jeep left, Officers observed via GPS

[1] Because Michalec's motion to suppress disputes the search and seizure of the Toyota, the court restates the relevant facts here.

that Package 1 began to move. The officers began tracking the package's movement in the silver Jeep. However, they lost visual contact of the silver Jeep at Chalan Rosario in Yigo. At approximately 5:01 p.m., the silver Jeep pulled into the G-Mart parking lot in Yigo. Def.'s Ex. AA. At 5:04 p.m., a silver Toyota Corolla entered the parking lot and parked next to the silver Jeep. Def.'s Ex. AA. Soon after, an individual exited the Corolla and entered the passenger side of the silver Jeep. *Id.* After the breaching device went off and signaled the officers that the package had been breached, the officers arrived at the parking lot at around 5:07 p.m., four minutes after the Corolla entered the parking lot. *Id.*

Officers found Sablan and Michalec in the silver Jeep with Package 1 opened, clue spray on both of their hands, drug paraphernalia in the vehicle, fifty-two gross grams of suspected methamphetamine hydrochloride, and $2,165 in U.S. currency. Gov't Exs. 7, 9. The officers found a pair of keys on Michalec after they conducted a pat down. However, they did not know that the Corolla belonged to him. Def's Ex. H004; Gov't Ex. 7-9–7-10. There was no testimony establishing that the officers knew Michalec owned the vehicle. To the contrary, Officer M. Calvo acknowledged that he assumed Michalec drove the Corolla because he had to have arrived at G-Mart to meet with Sablan somehow. The officers began to turn their attention to the Corolla. Def.'s Ex. AA. At around 5:08 p.m., four officers, including Guam Customs and Quarantine Agency Officer Rafaele Sgambelluri ("Officer Sgambelluri"), looked through the vehicle for the possibility that a third accomplice would be hiding in the Corolla. *Id.* The officers peered through nearly all sides of the vehicle: the rear window, the rear passenger and driver-side windows, and the front windshield. *Id.* The officers did not find anyone. Several minutes later, Officer Sgambelluri peered into the Corolla again to double-check for any suspects. *Id.* He did not find anyone. At around 5:18 p.m., long after Sablan and Michalec had been detained and taken away, Officer Sgambelluri opened the passenger-side door of the Corolla, where he saw

white substance in the pocket of the driver's side door. *Id.*; Gov't Ex. 7-15. Based on Officer Sgambelluri's finding of the contraband, the officers searched the vehicle and, upon opening the center console, discovered additional white substances that were later confirmed by the DEA to be methamphetamine hydrochloride. Gov't Ex. 7-13–7-14. The officers seized the contraband found in the pocket of the driver's side door and in the center console. Def.'s Ex. AA. At around 5:23 p.m., Officer Sgambelluri drove the Corolla from the parking lot for impoundment. Def.'s Ex. AA. DEA Officer Adam Grey ("Officer Grey"), however, later testified that car was parked at the law enforcement building's parking lot. He also testified that the officers released the car after they conducted an inventory search, and that it was never turned over to the United States Marshals Service for any formal impoundment.

## III. STANDARD OF REVIEW

On a motion to suppress, the controlling burden of proof imposes no greater burden than proof by a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). The defendant has the burden of persuasion in establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005). The prosecution, as the proponent of the evidence, must bear the burden of showing that the evidence challenged was reasonable under the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 357 (1967); *United States v. Jeffers*, 342 U.S. 48, 51 (1951).

## IV. DISCUSSION

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The exclusionary rule bars evidence collected in violation of the Fourth Amendment from being used at trial. *United States v. Shetler*, 665 F.3d 1150, 1156 (9th Cir. 2011).

Additionally, under the fruit of the poisonous tree doctrine, "evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was 'purged of the primary taint.'" *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). However, even though warrantless searches are typically "*per se* unreasonable under the Fourth Amendment[,]" they are reasonable when there is a valid "established and well-delineated exception." *Arizona v. Gant*, 556 U.S. 332, 338 (2009); *Verdun v. City of San Diego*, 51 F.4th 1033, 1037–38 (9th Cir. 2022). The Government bears the burden of proving that such an exception exists. *United States v. Scott*, 705 F.3d 410, 416-17 (9th Cir. 2012).

Michalec argues that the search of his Toyota Corolla revealing drugs should be suppressed because the Government did not have a search warrant or probable cause and no exceptions apply.[2] By contrast, the Government argues that the automobile exception to a warrantless search applies. Gov't's Opp'n to Def.'s Mot. to Suppress 4–6, ECF No. 41. During the suppression hearing, the Government argues that the inventory search exception is also applicable. The court addresses each exception below.

**A. Automobile Exception**

The automobile is an exception to the warrant requirement. *United States v. Ross*, 456 U.S. 798, 823–24 (1982); *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010). This exception allows officers to search a vehicle without a warrant (1) "if there is probable cause to believe that the vehicle contains evidence of a crime" and (2) if "the vehicle is readily mobile." *United States v. Ewing*, 638 F.3d 1226, 1231 (9th Cir. 2011) (internal citations omitted). "Probable cause exists if there is a 'fair probability that contraband or evidence of a crime will be

[2] The Government does not dispute that Michalec had standing to bring this motion.

found in a particular place,' under the totality of the circumstances." *United States v. Faagai*, 869 F.3d 1145 (9th Cir. 2017) (internal citations omitted).

The Government argues it had probable cause to search Michalec's car because he drove the car to the drug deal, parked his car next to Sablan's car, had clue spray residue on his hands from Package 1 in Sablan's car, and would have used his car to leave. Gov't's Opp'n 4–6. This argument is untenable because the Government failed to create a nexus between the controlled delivery of Package 1 and its connection to the Corolla.

At the suppression hearing, Officer M. Calvo testified that, when the officers arrived at G-Mart, they did not know who Michalec was or what connection, if any, he had to Package 1. It was only after discovering Michalec's driver's license that the officers learned about his identity. Moreover, Officer J. Calvo testified that the officers had no knowledge that the car belonged to Michalec until after they found a set of keys on him and unlocked the door. He conceded that the officers never saw the Corolla pull into the G-Mart parking lot or that Michalec drove the car. Additionally, Officer Grey, the lead agent for the controlled delivery operation, testified that it was only after the Corolla had been impounded that he heard from Officer De Chavez that Michalec orally stated to Guam Police Officer Eugene Pewtress that the car belonged to him.[3] Officer Sgambelluri testified that he was ordered to seize the Corolla for impoundment even before opening its door, indicating that officers had intended to seize the vehicle before discovering that it belonged to Michalec. According to Officer Sgambelluri, he did not discover the white substances in the driver's side door until after he opened the Corolla to take it for

[3] However, Officer Grey contradicts this testimony because he later claims that he heard someone state that the Corolla belonged to Michalec, but he could not identify who said it or when it was said. In any case, both Michalec's and Sablan's counsels disputed that the alleged oral statement had ever been disclosed in discovery. Additionally, Officer De Chavez, who purportedly relayed the statement to Officer Grey, had never testified that he heard Officer Pewtress's report of Michalec's statement. Moreover, DEA Resident Agent in Charge Dana Walker ("Agent Walker) testified that, during his interview with Michalec, Michalec made oral statements concerning his interactions with Sablan but declined to discuss contraband found in the Corolla. Agent Walker's testimony and the lack of evidence undermines Officer Grey's testimony of Michalec's alleged statement to Officer Pewtress.

impoundment. He further testified that he did not know who gave him the keys to the Corolla, much less whether the officers had probable cause to search it.

Even if the officers had known that the car belonged to Michalec, there was still no connection between the controlled delivery of Package 1 in the silver Jeep to the Corolla. Nothing under the totality of the circumstances suggest that the Corolla had any drugs in it, other than the officers' assumption that vehicles in the proximity of the silver Jeep could have drugs in them. But that assumption does not rise to probable cause, nor does it rise to reasonable suspicion.[4] At best, the officers relied on speculation and a hunch rather than any concrete facts that indicated that drugs could be found in the Corolla. The Government failed to prove that there was sufficient probable cause. Moreover, the car was clearly not mobile: the officers had the keys, and Michalec was detained. He was not going anywhere. Accordingly, the automobile exception does not apply.

The Government also makes a separate argument at the suppression hearing that the search was justified because the officers suspected that there was a possibility that a third accomplice was hiding in the Corolla. Indeed, in *Michigan v. Long*, 463 U.S. 1032 (1983), the Supreme Court upheld the application of a *Terry* search to automobiles if a police officer has a reasonable belief that danger may rise in the areas surrounding a suspect. *Long*, 463 U.S. at

[4] The officers' assumption did not stop with Michalec. A white Jeep was also parked next to the Corolla, one car away from the silver Jeep. An individual sat in the driver's seat when the officers arrived to the scene. The officers did not identify any measurable connection between the white Jeep, the individual driver, and the suspected criminal activity. The officers only assumed that the white Jeep was connected to Package 1 because they saw a white Jeep during their surveillance of the controlled delivery to the Garden Villa Hotel. Despite the lack of probable cause, Guam Police Department Officer Jeremiah Ryan Vega De Chavez ("Officer De Chavez") testified that the officers ordered the individual out of his car, detained him, and searched his car. DEA Officer M. Calvo also testified that the officers took this individual into custody and impounded his white Jeep. The officers testified that the innocent white Jeep driver, who was a frequent visitor at the store, was eventually released and his vehicle returned.The court finds this conduct deeply troubling. Based only on the white Jeep's mere proximity to the silver Jeep, the officers violated this individual's Fourth Amendment rights. This conduct reflects a disregard for the constitutional limits of law enforcement's authority and demands a need for better training by DEA to the various Task Force Officers and other law enforcement officers involved in future narcotics investigations.

1049–50. But the Government's argument is unavailing because the officers had, on two separate occasions, determined that there was no possibility of danger in the Corolla. First when the four officers peered into the car from various sides and then again when Officer Sgambelluri peered inside minutes later. If any threat had existed, the officers surely would have opened the Corolla right then and there. But they did not open the car until around 5:18 p.m., nearly ten minutes after peering inside. Therefore, the court finds that the officers' search was not justified by a need to determine potential safety threats.

**B. Inventory Search**

At the suppression hearing, the Government argued that the inventory exception applies. "The impoundment of an automobile is a seizure within the meaning of the Fourth Amendment" because it interferes with an individual's possessory interest. *Miranda v. City of Cornelius,* 429 F.3d 858, 862 (9th Cir. 2005). Warrantless searches and seizures by law enforcement are per se unreasonable unless a valid exception applies. *Id.* "The inventory search doctrine is an exception to the warrant requirement that allows authorities to search items within their lawful custody." *Snitko v. United States*, 90 F.4th 1250, 1261 (9th Cir. 2024). Officers must have non-investigative purposes to search the car, and the search must be based on something other than "suspicion of evidence of criminal activity." *United States v. Johnson*, 889 F.3d 1120, 1125 (9th Cir. 2018). In other words, "[t]he search cannot be a ruse for a general rummaging in order to discover incriminating evidence." *Id.* at 1126. Absent a finding of probable cause, law enforcement may "impound vehicles that 'jeopardize public safety and the efficient movement of vehicular traffic'" under the community caretaker doctrine. *Miranda*, 429 F.3d at 864.

Based on the testimonies at the evidentiary hearing, it appears to the court that the "impoundment" of Michalec's Corolla was a "ruse for a general rummaging in order to discover incriminating evidence." *See Johnson*, 889 F.3d at 1125. Clearly, the community caretaker

doctrine argued by the Government is disingenuous. First, the Government did not present evidence that the vehicle was impounded for public safety or that the Corolla caused traffic problems. Second, the Government did not follow their typical impoundment protocol. Officer Grey explained that, to impound a vehicle, the local police department's practice is to conduct an inventory search after transporting the car to the impound lot at the Guam Residence Office and before turning it over to the U.S. Marshals Service. That was not done here. The officers searched the Corolla at G-Mart and seized the substances found inside, and then again after transporting it to the impound lot. Officer M. Calvo's testified that, after the "inventory search," the Corolla remained at the lot until the officers released it to an unidentified individual who came to retrieve it the next day. Officer Grey explained that the officers only kept the Corolla overnight because they believed that Michalec would need a vehicle to drive home after he was released from jail. He further testified that, had Michalec's sister come to retrieve the Corolla on the evening that the car was taken, the officers would have released it then. Therefore, the officers did not formally impound the Corolla because they released the car instead of turning it over to the U.S. Marshals Service. Both the automobile exception and the inventory search doctrine does not apply to this warrantless search, therefore any evidence obtained from the Corolla is suppressed.

## V. CONCLUSION

Based on the discussion above, the court hereby **GRANTS** Michalec's Motion to Suppress Evidence. The methamphetamine found in the Toyota Corolla shall be suppressed. However, Michalec's oral statements do not relate to the Toyota Corolla and therefore shall not be suppressed. The court shall issue a separate order setting the trial schedule.

**SO ORDERED.**

**Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Nov 25, 2026**